Mr. Perry. Thank you, Judge Newman, and may it please the Court. The jury made the factual finding that the asserted claims are anticipated by prior art uses of native interferon beta, and that finding is supported by substantial evidence, including Dr. Lodish's testimony, and I quote, the beta interferon made recombinantly is the same interferon polypeptide as native human interferon, and that's page 79720 of the record. Dr. Lodish was summarizing the Interpharm report, a comprehensive scientific study that compared these two products and concluded at page 50559, quote, recombinant beta interferon is identical to human fibroblast interferon, end quote. And the jury was instructed that the polypeptide of the claims, and these claims recite a polypeptide, not a protein or a glycoprotein, is, quote, a linear sequence of amino acids. That's at page appendix 47651. And Biogen itself introduced evidence that, and I'm quoting again, the amino acid sequence of Rebif, which is our recombinant product, is identical to that of natural fibroblast-derived human interferon beta. But wasn't the question not so much the amino acid sequence, but whatever else, particularly the carbohydrates attached to the polypeptide, as to whether they were identical or not?  That's the question the district court decided after the verdict. But isn't that a question that is necessary to answer because the claim refers to a therapeutically effective amount? No, Your Honor, for two reasons. First, the claim refers to a polypeptide, and the patent defined polypeptide as the sequence, and the jury was instructed on the sequence. The jury was never instructed on three-dimensional structures, glycosylation, sugars, carbohydrates, and Biogen never requested such instruction. None of that was part of the anticipation analysis before the jury, and this is a jury finding of fact reviewed for substantial evidence. So they waived all those arguments. But second, and more importantly, therapeutic effectiveness or biological activity requires a three-dimensional structure, not carbohydrate groups, but a three-dimensional structure. And the evidence on three-dimensional structure is very clear. This is Appendix 50541, quote, the two protein molecules have the same three-dimensional structure. So that even if the question were the protein and not the polypeptide, they have the same three-dimensional structure. So there's no specific three-dimensional structure at issue here? They all have the same. They all interfere on beta proteins. There is a fundamental mischaracterization by my friends on the other side that somehow there is a difference within these populations that is false. Polypeptides of this sequence are interfering on beta. If you don't have the sequence, it is not interfering on beta. And by the way, the patentee here chose to define his claims, Dr. Feers, by the polypeptide because two reasons. He did not have possession of the complete protein. He never expressed a complete protein or characterized a complete protein. And Judge Newman, specifically as to the carbohydrate groups, Dr. Feers worked only in E. coli bacteria, which do not glycosylate. They do not create carbohydrate groups. So he never had possession of a carbohydrate group. He never disclosed or enabled a carbohydrate group. And he certainly did not claim a carbohydrate group. So this whole argument about carbohydrate structures that the district court latched on after the verdict was not submitted to the jury, is not part of the verdict, is irrelevant to the case, is not in the claims, and is contrary to the way the applicant did this. In fact, their infringement case, they didn't prove carbohydrate structures. They didn't prove three-dimensional structure. They proved a linear sequence of amino acids. And there's a difference here, by the way, between various claims in the preceding cases of this court. The Amgen case, which of course is front and center here. The Amgen patents claimed a glycoprotein, a glycosylated protein. And therefore, the carbohydrate groups were important. This patent does not claim a glycoprotein for the simple reason that Dr. Feers was never in possession of a glycoprotein. He never even saw a glycoprotein. And he could not have claimed a glycoprotein. And therefore, the carbohydrate groups are literally irrelevant. And all of that discussion is not germane to the patent. There's a third argument I'd like to add to this point. Biogen brought an expert, Dr. Garcia, to the trial to rebut the defendant's invalidity theories. He had three opinions, one of which was solely on anticipation. And it was solely that these two molecules are different because of the carbohydrate structures. The jury heard Dr. Garcia testify about that over and over again. And in closing argument, this is what Biogen told the jury they had to decide. If we want to get into the facts, into the facts, Dr. Garcia explained that it's wrong for this legal concept of anticipation, the natural human interferon would have to be exactly the same as recombinant. And it's not. That, in fact, was Biogen's entire argument on anticipation. And the jury rejected that. The jury found that they are exactly the same. And to come back to where I started, this is a substantial evidence case. This is a jury verdict. I thought it wasn't disputed that there were differences, that the differences were not in the polypeptide portion of the interferon, but in the attachments. That is incorrect, Judge Newman, and let me explain. The Interpharm study, which is a pre-litigation, neutral, scientific examination of this question asked, are these two products identical? The Interpharm study went through 13 structural measures and seven functional measures and found that the proteins are identical on every single metric. Yes, the proteins are identical. Yes, Your Honor. I think that was undisputed. That is absolutely undisputed. And so the only question is, is there any difference in the carbohydrate structure, which is not claimed and was not presented to the jury in the jury instructions. But even to answer that question on the science, which I submit is not before the court, given the jury verdict, we have a finding of fact here. But if we were to talk about that, the evidence on the carbohydrate structures is the populations are overlapping. There's more than 80% identicality in the molecules at the atomic level in a population of human interferon beta and recombinant interferon beta. And that's in the Kagawa study, table three. It's also in the Interpharm study. These are comprising claims. The administration of a compound comprising blah, blah, blah. The polypeptides. The patients in the prior art that received the native necessarily, absolutely received the identical, atomically identical to the carbohydrate structure of the recombinant because there's 80% population overlap. And so when they talk about the differences, Your Honor, it only is that very small part of an unclaimed- Are you saying they're the same carbohydrates? They are the same carbohydrates. Yes, Your Honor. And the Interpharm study goes through the carbohydrates very carefully at 505- It was clear that they are carbohydrates, but I thought it was undisputed that they were different carbohydrates. No, Your Honor. Let me try to explain. And this is at 505-29 to 505-31 of the Interpharm study. The biantenary glycan chain, which is the carbohydrate structure, is, quote, identical in its structure. So the branches of carbohydrates that come off of the polypeptides are identical. The micro-heterogeneity, to use the word of the Interpharm study, is that certain of the individual sugars in the glycan chain vary within the population, and Kagawa determined that there's seven different micro-variants in the individual sugars, but the structure is identical. Okay, would you turn to the use and to the point that the district court made that what's claimed is the use of the synthetic product? Well, there's two points there, Your Honor, if I'm understanding the question. The first is that this is pitched as a method of treatment patent. Biogen admitted at trial that it invented no method of treatment, so that the use was known. This is an old use of a product. You know, Biogen's lead expert was asked, there's no new information about treatment in the patent. We agree. And in fact, again, in closing, Mr. Groombridge, who we'll hear from in a minute, says, quote, no one is suggesting that Dr. Feers came up with a new way of treating some disease with beta interferon that had never been used before. Well, it can't be an old use of a product before the product existed. Your Honor, that's the whole point. The product did exist. The polypeptide, the 166 amino acids arranged in a linear sequence, is identical. There is absolutely no difference. As the natural product and the recombinant product. Figure four of the patent shows the DNA sequence and the amino acid sequence. They are identical, identical, identical. But there's no prior art, is there, that explicitly discloses this method using the recombinant interferon? Your Honor, the prior art shows everything except the recombinant source limitation, which brings us to how we got here, right? Let's remember what happened. Let's rewind the tape a little bit. I mean, what baffles me in this case is how the jury could have found anticipation but not obviousness, when it seemed like there was a method out there that everybody knew using the natural form, and the recombinant versions were also in the prior art, but just not put together. But since they did find no obviousness for whatever reason, and you're not challenging it on appeal, then it seems to me that it's still an important question whether for anticipation there's enough difference between the recombinant form and the natural form that the method is not explicitly anticipated. Judge Hughes, I agree with the last part of that, which is it was our burden, the defendant's burden, to prove that the two molecules were identical. That was the challenge set to us by the Amgen case, which says, it's a question of fact, quote, does the source limitation distinguish the recombinant protein from the native protein? That's the holding of Amgen. That's the factual question when you have a source limitation. And there's no dispute in this case that the recombinance, the recombinant production, is a source limitation. And we proved with multiple evidence. I mean, we've got pages and pages of evidence that they are identical. Certainly, the claimed polypeptides, the polypeptides of the claims are identical. Before you run out of time, and there are a lot of issues in this case, can I just ask you about the jury instruction on the contributory infringement and not allowing them to consider reasonable belief in non-infringement? Yes, Your Honor. Can you just address that? Sure. The point is very simple. The Camille Court, the Supreme Court, made clear that a good faith belief in non-infringement is a defense to both contributory and inducement, which is obvious because they both have the knowledge requirement. The Supreme Court said that in so many words. We asked for that instruction to be given, and the district court refused. And the prejudice was enormous. Mr. Groombridge, my friend here, stood up in closing argument and said, what's in their heads doesn't matter. Now, remember, their burden of proof was to show that we knew that the product acts on MS through immunomodulation. And he said, what's in our heads doesn't matter, and that jury instruction didn't give the jury any way to evaluate what was in our heads because the evidence, again, was undisputed that we did not know, and we do not know to this day how it works. And if we find error on that, the remedy is what? That's a new trial. A new trial on that issue? Yes. And how does that affect the inducement prong? I know it's a little bit different, but does there need to be a new trial on inducement as well? We would submit that the jury's verdict on inducement is amply supported, not to be reinstated as with the verdict on anticipation. The district court took away the no-inducement verdict based on this flawed contributory verdict and a finding that no reasonable jury could find that we didn't know how the product worked, even though the evidence is undisputed that we do not know how the product worked. If I could reserve the balance of my time. Let's hear from the other side, and we'll save you rebuttal time. Thank you, Your Honor. Judge Harris? Good morning, judges. I'd like to start with the anticipation question. And maybe, Judge Hughes, I could talk just to the question of how could the jury have found anticipation but not obviousness. The entire focus of this five-week trial was obviousness. And it was about whether or not the recombinant material is or is not biologically active. And that's what these leading scientists around the world were in a race to try and prove. So obviousness was very much what the jury was looking at. And the question, I think, was all about biological activity. Now with respect, I'd like to respond to what my good friend, Mr. Perry, has said about identity of molecules. The evidence here, the only evidence, is that the molecules are not identical. And, in fact, he refers to the Interpharm report. We have some issues about that because it's many years after the priority date. But assume that that is competent evidence of what was in the prior art. The Interpharm report shows that there is not one single identical molecule in recombinant DNA and native human beta interferon. But the linear amino acid chains are the same. Exactly, Your Honor. The amino acid chain is the same, but hanging off that chain are the sugar moieties. And at appendix 50528, at the top of the page, there is a handwritten drawing showing the sugar structures that are in the native product and the sugar structures, carbohydrate structures, that are in the recombinant product. And they are different. They are not the same molecules. Not one of them is the same. And the reason that Mr. Perry can say, quote pieces talking about saying that structures are identical, is because they are defined by structural formulae that have variables like N can be 0 or 1. And so, in the native, it's 0, and in the recombinant, it's 1, or vice versa. They're not the same molecule. And when their expert was asked by one of their lawyers about the conclusion of the Yusufan report, this is Dr. Lodish, he disagreed with that language saying that they're identical. His response to the question was, I would not call them identical, I would call them very similar. And that is the entire point here. And by the way, the Kagawa reference at 51646 says, it literally says, recombinant beta interferon is, quote, quite similar to its native counterpart, except for, and then it lists three structural differences. And so, there is no evidence here on which a jury could have found that the molecules are identical or not identical. And indeed, the entire reason for the non-human limitation in the claims is that, is to make sure that the claims don't cover the use of native beta interferon. And so, we have all of that. Now, I think maybe perhaps there's a legal dispute. I take the appellant's premise here to be that as a matter of looking at the claims, their argument is, well, even if there's a difference in these carbohydrate or sugar structures, that's not claimed. And we think that that is completely wrong. So first of all, Judge Lynn, as Your Honor commented, these claims specifically call out a therapeutically effective amount. So, that the thing has to be biologically active. To be sure I understand, when you say there are three structural differences, you're not talking about the protein then? You're talking about the entire molecule with the attached, the pertinent sugars? Exactly, Your Honor. Right? That the differences reside in the sugars or carbohydrates. Just as in the case in this court in 2009, that's the difference and it's what makes the recombinant product novel. It didn't exist in nature. And therefore, it can be patented and therefore, the use of it is not anticipated by the use of native beta interferon. Now, we separately, in our view, the mere fact that the claim recites recombinant distinguishes prior art because as Judge Hughes asked previously, there is no prior art that shows any usage of recombinant. If the court... If they could have proved that the recombinant and the native interferon are exactly the same with the fact that there's no prior art on the recombinant matter? In our view, Your Honor, yes. And the reason is because this is a method claim, not a product claim. And why do I say that? The question with the product claim is whether the product is new or old. Is it in the prior art? Regardless of how it be made. But with a method claim, the question is, was this series of actions performed in the prior art? And as the district court found in claim construction, the source limitation, while it need not be performed by the direct infringer, by the person who's administering the drug, does have to be performed, quote, by someone somewhere at some time. And therefore, in our view, Your Honor, the proper analysis here is that this claim requires a series of activities by human beings, which activities never occurred in the prior art, and therefore can't be anticipated. Well, if the claim is limited to the polypeptide and the native interferon is therapeutically effective, just as the recombinant interferon is therapeutically effective, then why isn't that the same? I think, Your Honor, in that situation, if one were to conclude that the structure of the carbohydrates is irrelevant, and if one were to conclude that Biogen is wrong, and this idea that it requires people to have engaged in activities to satisfy the source limitation, then that result would float. Yeah. And tell me why that's the wrong conclusion. Well, so I think the first point is that the source limitation here is a meaningful limitation in this claim. I don't believe there's any dispute on that, but certainly that was what the district court found. And therefore, it requires that the recombinant creation of the molecule have been done, just not by the person who's actually then going to administer it to the patient in need thereof. And if the court accepts Biogen's view on that point, then that is the end of the story. We don't need to get into any of the questions or any of the other questions because it's not worth the anticipation. And I would also like to say that just before I leave this, Your Honor, that to this point of it's not claimed, the sugar structure's not claimed, that's wrong. If you apply product by process law, which of course the appellants argue one should, this court in Amgen, and then following Amgen in Greenland and Purdue, explicitly said, if the process limitations of a product by process claim confer structural difference over the prior art, even though that structural difference be not explicitly recited in the claim, it is nonetheless part of the claim because of the process limitations in the claim. And therefore, in our view, that absolutely brings us to say that these differences of polypeptide means nothing more than an array of amino acids or whether you think it connotes biological activity. And that in fact was the very point of distinction in the Amgen case where that principle of law was first enunciated. And so in our view, because the source limitation, recombinant production, necessarily leads to a difference at the molecular level, the difference at the molecular level in the carbohydrates is part of the claim. And so with that, I would turn to the intent question about contributory infringement and inducement unless the court has further questions on anticipation. Okay. So, Judge Hughes, to pick up with your question, in our view, the issue is this. And maybe what it sets up is, what is the difference in scienta between contributory infringement and inducement? And that issue has not been squarely addressed, we think, either by this court or the Supreme Court. And the question then, if we look back at that, we know that they have scienta requirements. We know from Kommel that those requirements are similar. That's the word that Kommel uses, but not the same, therefore. And if we look at the origin of contributory infringement, as for example, Judge Rich laid it out in 1990 in the opinion in Hewlett-Packard versus Bausch and Long, it was a type of indirect infringement that was specifically carved out in the 1952 statute from everything else that was going to be inducement. And the reason that it existed was because if certain circumstances were met, intent to infringe, and that means intent to infringe could be presumed, and that is what the Supreme Court said in Grokster, that that is the reason why contributory infringement exists. We can presume intent to infringe. Those are the very words of the Supreme Court in Grokster. And therefore, if we were to adopt the principle that is advocated by the appellants here, it would render contributory infringement mere surplusage, because it would say that the only reason why contributory infringement exists in the statute is for this, to presume intent. If I nevertheless have to prove the same intent, then there's no reason for contributory infringement even to be there. It's simply inducement plus some extra requirements, right? And so that can't be the right answer. And in fact, we think there is guidance, as the district court found in section 298, which says declining to waive privilege can't be held against you for purposes of inducement, but is silent on contributory infringement. We think that that is a clear indication that intent, the type of intent that would be proven, for example, by reliance on advice of counsel, is not an element of contributory infringement. If the appellants are right, then the law says that I can ask for an adverse inference based on your failure to waive privilege for contributory infringement, even though the statute explicitly prohibits that for inducement. And in our view, that cannot be the right answer. The whole reason that contributory infringement exists is because it has a lower standard of scienta. And we would candidly admit, this court has never squarely addressed what is the lowest standard. It has articulated that it's lower. It has talked about it in a number of cases. But haven't we addressed from the beginning that the issue is whether there is a substantial non-infringing use? The difference? Your Honor, that aspect has certainly been addressed. And here, there is no dispute. It's not challenged that the product in question has no, never mind substantial, has no non-infringing use whatsoever. Right? That, but the purpose of... Sure, but this isn't a product claim. I mean, this is a method claim. And so if they think that because of the way they construe your claim, that their sale of this doesn't infringe that method, why isn't that relevant to their belief, reasonable belief in whether they're infringing or not? And I think I would direct the court to the Grokster case. And what I would say, Your Honor, is that that's exactly why contributory infringement exists. In the circumstance where you know of the patent, you know of the infringement, and we could have a debate about what know of the infringement means, but it's less than intend the infringement. And you make a product that has no use other than to infringe the patent, intended for you. No, but isn't that the whole point here, is that their view of how this method works, the product can be used in a way that doesn't infringe that method. It turns out if we accept everything else, they're wrong. But their claim construction of this method meant that their sale of this product or, you know, offering it to doctors or stuff didn't infringe the method, even though the molecules may have been the same or the like. But doesn't that still go to whether they had the specific level of intent for contributory infringement? No. Putting aside inducement. I would say no, Your Honor, because in that case, there would be zero difference between the contributory infringement and inducement. So the only reason for contributory infringement to exist is for that not to be the case. So that if you are injecting into the stream of commerce something that has no use other than to infringe, and you know- But again, I think maybe we're talking past each other, and this is weird, because they have a claim construction theory, which I think, frankly, is not correct. But if they reasonably believe that this incorporated the product by process and all that kind of then their sale of interferon doesn't necessarily infringe that when they didn't make it or they didn't make it in this country or all that. Why is that not relevant to contributory infringement? What we would say, Your Honor, is for inducement, that would be true. But for contributory infringement, because there is necessarily a lower standard of scienta, that's not true. So let me flip it then. Let's assume their claim construction is correct and that this claim isn't just a method claim of treatment. It also incorporates the product by process limitations and everything else they ask for. Do they do all of that? They have done it. The reason why they are saying they would not infringe is because they did it. Some of it they say before the patent issued, and they make the product in another country. But they certainly do it. There's no dispute that they do it. The argument is that I don't do it within the jurisdiction, or I did it before your patent issued. That's why they say they don't infringe. Well, I mean, if they did it before the patent issued, it's not infringement, right? I don't want to get tied up in extra-territorial stuff, because that stuff is really confusing. Or at least to me. To me, too. You're right. Right. Right. But if they had only done, if this required, and again, I know you don't agree with this, and this may not even be the correct articulation of the facts, but if part of this was the only time you do that is once, and it was before the patent, that wouldn't infringe, right? Hypothetically. Under their claim construction, if you say it's a three-step method, and one of the steps is creating the cell line, that's correctional. I don't understand why they weren't allowed to present that to the jury, even if the claim construction ultimately turned out to be incorrect. They did present it to the jury. They presented it to the jury in the context of the patent. But they weren't allowed to present their argument that their belief in that claim construction somehow negates. Yes, they completely were, Your Honor. They presented that for inducement. But not for contributory. The district court had found that while it was relevant evidence and the jury heard it, and for example, the district court's claim construction opinion is part of the evidence here because of this. They were not allowed to argue that it negated contributory infringement. They were allowed to argue, and did argue, that it negated inducement. And one final point I would make here, Your Honor, just to your question of what would be the consequence if the court were to agree with the appellants on this, we haven't spoken about FISA. FISA is a co-defendant that never articulated a reasonable belief in non-infringement. And therefore, in our view, whatever the consequence may be for EMD Serrano, it does not apply to FISA, and therefore, that would, that part of the verdict would stand. And unless the court has further questions, I will, I know I've already gone over my time and I apologize. Thank you, Mr. Groombridge. We've enlarged your time a little bit. Thank you, Judge Newman. Three quick points on anticipation. Mr. Groombridge agrees that the polypeptides are identical. Under substantial evidence review, and the jury instructions actually given with no objection in this case, that's the end of the appeal. The verdict has to be reinstated. The jury was only instructed on polypeptides. Mr. Groombridge's entire argument was based on sugar groups, carbohydrates. There is no instruction on sugar groups or carbohydrates. Biogen did not request one, and the district court did not give one. That was not presented to the jury in this case. They are asking for something that they didn't ask the jury for. If they had asked the jury to consider it, the jury had plenty of evidence. Let me give you just one more example, and there's Reams. The Revell patent, which is in the record, 51578, quote, hamster cells glycosylate proteins identically to human cells. And there's more, and there's more. The jury heard all kinds of evidence that they're identical even as to the carbohydrates. Their expert didn't agree. Their paid expert brought here for that purpose, but the jury didn't have to believe him. And so what was actually presented to the jury was this. Judge Lind, to your question about the claims, the claim is to a polypeptide. They never sought a claim construction that said it included the sugar groups for good reason. Dr. Feers did not know, boo, about the sugar groups. They were not in his experiments. They could not have been claimed because he was not in possession of the invention. He never characterized the complete protein. They could not have got that as a claim construction. Do the words therapeutically effective in the claim have no consequence? Of course they have consequence. It says that when you put this substance, the amino acid sequence, into the body, it has to change the human functioning. That's all that therapeutically effective amount means in any... Doesn't that implicate the entire three-dimensional structure with the sugars, et cetera? Not the sugars, Your Honor. In fact, let's remember what Dr. Feers' experiment was. He set out to prove that he could force an E. coli cell, a bacterium, to produce this polypeptide with no glycosylation and still have a three-dimensional structure and biological activity. In fact, that's what they now say was the invention has nothing to do with glycosylation because it was not glycosylated. So for them now to say that the point of novelty is glycosylation when his so-called invention was proving that an un-glycosylated molecule had biological activity, had they presented that on claim construction, it never would have survived. It also, by the way, if that's really their argument, come up for the first time after the verdict in this case, it runs straight into 112 because nowhere in this patent are the glycosylation, the three-dimensional structures, enabled or described. No person of skill in the art could learn about the glycosylation structure from this patent because he worked only in bacteria that do not glycosylate. And all of the disclosure, there's 30 pages of the specification, discloses un-glycosylated polypeptides. That's why the jury was instructed on the polypeptide. And what you heard in 15 minutes of argument was nothing that there's not substantial evidence. And this is substantial evidence review. Which brings me to my final point of anticipation. Judge Hughes, you asked about the Amgen issue and the so-called source limitation and whether it applies. First, Biogen waived that. They didn't bring it up on Rule 50A. And most importantly, they didn't object to the verdict question. The verdict question was, does Native anticipate? They can't give that to the jury and then turn around and say, as a matter of law, Native can't anticipate. They accepted Amgen for purposes of the trial and then pulled out this free option to try to win later. That's unacceptable as a matter of civil procedure, trial practice. You don't get to do that. And even if it's not a product by process claim, it doesn't matter. This is a principle of novelty. This is a principle that says, if I claim a molecule, whether it's from Ohio or from a hamster or from anywhere else, that source limitation matters only if it affects the chemical structure of the molecule, the structural and functional characteristics. And we proved over and over and over and over again that these things are identical. I have to come back to the Interpharm study, the conclusion of which recombinant interferon is identical to human interferon. I mean, that's the only thing we need to know to sustain this jury verdict as the way it was actually submitted to the jury in this case. This is a jury verdict. We're not sitting to review a bench trial. This is a jury verdict. And as the jury was instructed on agreed instructions and an agreed verdict form, that anticipation verdict can only be reinstated under the law. I see I've exceeded my time. Thank you for your consideration. Thank you. Thank you both. The case is taken under submission.